Judgment rendered April 22, 2020.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 53,431-WCA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

JOE WHITTEN                                    Plaintiff-Appellant

versus

PATTERSON UTI DRILLING                         Defendant-Appellees
COMPANY, LLC AND LIBERTY
MUTUAL INSURANCE
COMPANY

* * * * *

Appealed from the
Office of Workers' Compensation, District 1-W
Parish of Caddo, Louisiana
Trial Court No. 18-04453

Linda Lea Smith
Workers' Compensation Judge

* * * * *

FISCHER & MANNO                                Counsel for Appellant
By:  Mark K. Manno
     Timothy R. Fischer


THOMAS SOILEAU JACKSON, ET AL                  Counsel for Appellees
By:  Patrick F. Cole
     Haley G. Baynham
     Erica Marie Ducoing

* * * * *

Before MOORE, STONE, and McCALLUM, JJ.

**MOORE, J.**

Joe Whitten appeals a judgment of the Office of Worker's Compensation that denied his claim for medical treatment on a finding that after a work-related injury temporarily aggravated his degenerative disk disease, his back had returned to its pre-injury condition. For the reasons expressed, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Whitten, who lives in Kilgore, Texas, had been employed by Patterson UTI Drilling ("UTI") since 2002. By May 2016, he was working as a driller, at an average weekly wage of $1,409.

On May 31, 2016, he was working on the 13th night of a 14-day shift on a UTI rig in DeSoto Parish; he described that night's situation as "tripping out wet all over." As he tried to go down a metal staircase to wash up, he slipped on the oil and mud, fell down the stairs some 10-12 feet, and landed on his back. In the fall, he struck his left knee, neck, and right shoulder on the railing, but these injuries are not the subject of the appeal. Rather, he landed on his back and hurt his lower back. Nonetheless, he completed the night shift, rested, and then worked the final day of his 14-day shift. He then took his 14-day off-time, and came back for his next 14-day shift. He testified that during this time frame, if he got sore, he just took some Ibuprofen. However, by the time he completed those 14 days, he was "hurting all over."

On June 30, he went to Willis-Knighton Work Kare in Shreveport. He told Dr. John Goddard that he'd had "some back strains in the past, but nothing that lasted more than a few days." An X-ray was taken that day and interpreted by Dr. James Price to show nothing acute, but degenerative

changes and spondylolysis at L4.  Dr. Goddard sent Whitten home to apply heat and use nonprescription medicines, and released him to regular work.

Whitten returned to Work Kare in July and August, and each time, Dr. Goddard released him to light work.  In late August, however, owing to Whitten's continued complaints, Dr. Goddard ordered an MRI.  This showed disk degeneration at L1-2, L2-3, L3-4, facet arthrosis at L4-5, and disk desiccation and facet arthrosis at L5-S1.  As Whitten was rating his pain a "5," Dr. Goddard referred him to an orthopedist-spine specialist.

Whitten went to Dr. James Michaels, a pain management specialist at Azalea Orthopedics, in Tyler, Texas.  Dr. Michaels reviewed the MRI and suggested a nerve root block, which Whitten took twice, in October and December 2016.  Although Dr. Michaels initially noted a "40-50% response," Whitten testified they were "no help at all."

In January 2017, Dr. Michaels referred Whitten for a surgery consult.  A physician's assistant at Azalea took X-rays in late March, and noted degradation at L2-3 and L3-4 and "other spondylosis with radiculopathy."  A different doctor at Azalea, Dr. Michael Merrick, recommended another MRI, which was done on May 12.  This found decreased disk space from L1 all the way down to S-1, with mild facet arthrosis at L4-5 and L5-S1.  Dr. Merrick then suggested a spinal cord stimulator ("SCS").  However, when Whitten came back to Azalea on June 12, he saw Dr. Michaels, who told him that no further treatment was needed.

Through this time, Whitten had used the Texas Department of Insurance Workers' Compensation system.  UTI's carrier had provided all medical expenses and UTI had paid (and continues to pay) either indemnity benefits or wages in lieu of compensation.  Whitten testified that he hired

Louisiana counsel to "transfer his case" to OWC; the disputed claim was filed July 5, 2018.

Meanwhile, Whitten had selected Dr. Euby Kerr, at Spine Institute of Louisiana, as his treating physician, and saw him in December 2017. Dr. Kerr looked at Whitten's MRIs but told him he was not a surgical candidate because of his excessive weight, nearly 400 lbs. However, like Dr. Merrick, Dr. Kerr suggested an SCS, and ordered a new MRI. The February 2018 MRI showed a high-intensity zone lesion and posterior annular tear at L5-S1, extensive degenerative changes from L2 to L4, and a "subtle spondylolisthesis developing" at L4-5. Dr. Kerr later testified that he considered the L4-5 condition "dynamic" rather than degenerative.

Another doctor at Spine Institute, Dr. Rama Letchuman, suggested a "trial" SCS, which he implanted in April 2018. Whitten testified that this "took the edge off" the pain, so Dr. Letchuman recommended implanting a permanent one.

However, UTI's carrier wanted a second opinion, and it hired Dr. Gordon Mead, an orthopedic surgeon in Shreveport, to examine Whitten. Dr. Mead saw him in late February 2018 and diagnosed preexisting degenerative disk disease, aggravated by the fall at work in 2016. He reported that Whitten had reached maximum medical improvement, and was having chronic pain only because of his morbid obesity. Dr. Mead expressed no opinion as to an SCS, suggested that Whitten have a functional capacity evaluation, and said he could return to work.

UTI's carrier had approved surgery to implant the permanent SCS, but on September 6, 2018, one day before the planned procedure, it revoked approval, citing Dr. Mead's finding of maximum medical improvement.

3

Since that date, the carrier has provided no more medical benefits to Whitten.

On September 14, Whitten amended his disputed claim to demand approval of the SCS, with a penalty and attorney fee for UTI's failure to reasonably controvert this claim. Claims based on the other injuries sustained in the fall (left knee, neck, shoulder) were withdrawn pretrial.

## SUMMARY OF TRIAL EVIDENCE

The matter came to trial in April 2019. Counsel stipulated that the only issue was whether the work-related fall caused Whitten's spinal injury; if so, whether UTI owed penalties for failing to reasonably controvert the claim.

The only live witnesses were Whitten and his wife. Whitten fully described how the accident happened, his course of treatment (outlined above), his desire to continue working, and his confidence that Dr. Kerr could perform a back surgery to restore him to health. He admitted being in a minor auto accident in 2013, and missing one day of work as a result, but insisted he had worked regularly his whole life until the accident at UTI (at which time he was age 44). He also admitted that he needed to lose weight, but claimed that he had already dropped from 410 to 370 lbs.

Whitten's wife confirmed his testimony, adding that he had always weighed from 300 to 350 lbs. and was never much for exercising or going to the gym.

Whitten also offered Dr. Kerr's deposition, which stated that he had read only the radiology reports from after the auto accident (the actual 2013 X-ray films were no longer available), and these showed only minimal subluxations from L2 to L4. However, after the work accident, the X-rays

and the first MRI showed degenerative disk disease and L4-5 spondylolisthesis, which he considered a "definite change" since 2013. Dr. Kerr disagreed with Dr. Merrick's view that there was no spondylolisthesis, and with Azalea Orthopedics' recommendation not to have surgery. As noted, he considered Whitten's condition "dynamic spondylolisthesis," definitely caused by the work accident, stated that an SCS would not help, and felt that the patient's only hope is a two-level, 360-degree fusion at L5-S1 and L4-5. On cross-examination, Dr. Kerr admitted that most problems at L4-5 are degenerative, though some can be traumatic; that he initially said that Whitten was *not* a surgical candidate, but he changed his mind; and that Whitten's morbid obesity, diabetes, and overall health may have factored in his current condition, but they did not cause it. Finally, although he now favored surgery, Dr. Kerr said he would not perform it until Whitten lost another 30-40 lbs.

Other documents offered by Whitten included medical records from Good Shepherd Hospital, in Longview, Texas, that included the radiology reports from November 2013 showing degenerative changes in Whitten's lumbar spine, some 2½ years before the work accident. Work Kare records from Willis-Knighton showed that Dr. Goddard twice released Whitten to light-duty work before September 2016, as did the Texas Workers' Comp system, in late 2016. OWC documents showed that UTI's carrier initially approved, and then withdrew approval for, the permanent SCS. Counsel's affidavit shows that Whitten had unpaid bills of $3,346.53 with Dr. Kerr, and 20 hours of attorney fees, at $250 an hour.

UTI offered the deposition of Dr. Mead, who had been hired for a medical second opinion and examined Whitten in February 2018. Based on

Whitten's medical records, Dr. Mead found degenerative lumbar disk disease that predated the work accident. He felt that the work accident aggravated the preexisting condition, but that the period of aggravation had passed, Whitten had reached maximum medical improvement, and the main cause of his chronic back pain was extreme obesity. On cross-examination, Dr. Mead admitted that his main field of practice was foot and ankle; that he had no experience with the SCS; and that there was no evidence that obesity caused disk degeneration.

### ACTION OF THE WORKER'S COMPENSATION JUDGE

The WCJ wrote an 18-page opinion, identifying the issue as whether Whitten's present disability continues to be the result of an aggravation of his preexisting, degenerative lumbar condition. She then catalogued Whitten's wide-ranging medical evidence. She stated Dr. Kerr's position as follows: even though Whitten has some degenerative changes, "the L4-5 spondylolisthesis and L5-S1 herniated disk are not degenerative and were caused by the work accident." She stated Dr. Mead's position as that "Whitten suffers from degenerative changes, and not injuries related to the work accident[,]" the period of aggravation lasted about six months, and he has returned to his pre-accident baseline. She also noted that Drs. Goddard and Merrick, who treated Whitten earlier, had found "no acute, objective injury to the lumbar spine."

The WCJ found that Dr. Kerr's view was not fully supported by the medical records, or by Drs. Goddard's and Merrick's reports, and was contradicted by Dr. Mead. She concluded that Whitten's current condition was a "progression of the degenerative disease from 2013 through 2016[,]" in addition to "morbid obesity [and] other health issues." In short, Whitten's

6

current condition was no longer a result of the work accident. The WCJ rendered judgment rejecting all claims.

Whitten has appealed, raising four assignments of error.

## DISCUSSION

### *Incorrect Burden of Proof*

By his first assignment of error, Whitten urges the WCJ erred as a matter of law by requiring the claimant to meet a higher burden of proof than required by law. He contends the WCJ made him "prove a negative," on the basis of this passage from the written opinion:

> The issue herein is not whether there was an aggravation of the preexisting condition, but rather, whether that aggravation has ended. * * * The testimony and evidence fail to show whether the natural progression [of Whitten's back problems] would not have naturally progressed.

He argues that in this way, the WCJ required him to prove that his current condition was "not caused by something other than the accident." He also shows that the WCJ cited three cases: *Koenig v. Christus Schumpert Health Sys.*, 44,244 (La. App. 2 Cir. 5/13/09), 12 So. 3d 1037; *Blake v. Turner Indus. Group*, 2012-0140 (La. App. 1 Cir. 9/21/12), 111 So. 3d 21, *writ denied*, 12-2288 (La. 11/30/12), 103 So. 3d 376; and *Henderson v. Graphic Packaging Int'l Inc.*, 48,491 (La. App. 2 Cir. 11/20/13), 128 So. 3d 599. He contends that these cases simply do not require the plaintiff disprove other causes of the injury, including a natural progression of a preexisting condition. He submits that this was legal error warranting de novo review.

An employee is entitled to workers' compensation benefits if he "receives personal injury by accident arising out of and in the course of" his employment. La. R.S. 23:1031 A. The claimant is not required to prove the exact cause of the disability, but he must show by a preponderance of the

7

evidence that the accident had a causal connection with the disability. *Iberia Medical Ctr. v. Ward*, 09-2705 (La. 11/30/10), 53 So. 3d 421; *Crawford v. Town of Grambling*, 51,090 (La. App. 2 Cir. 1/11/17), 211 So. 3d 660, *writ denied*, 17-0284 (La. 4/7/17), 218 So. 3d 110. Where the claimant suffers from a preexisting condition, he may still prevail if he proves that the accident aggravated, accelerated, or combined with the disease or infirmity to produce disability for which compensation is claimed. *Peveto v. WHC Contractors*, 93-1402 (La. 1/14/94), 630 So. 2d 689; *Hill v. IASIS Glenwood Reg'l Med. Ctr.*, 50,531 (La. App. 2 Cir. 5/18/16), 195 So. 3d 536, *writ denied*, 16-1357 (La. 11/7/16), 209 So. 3d 104. In this situation, the employee is entitled to compensation for the duration of the aggravation. *Blake v. Turner Indus. Group*, *supra*; *Read v. Pel-State Oil Co.*, 44,218 (La. App. 2 Cir. 5/20/09), 13 So. 3d 1191; *Frye v. Olan Mills*, 44,192 (La. App. 2 Cir. 4/8/09), 7 So. 3d 201; *Merriett v. Budget Build Lumber & Supp.*, 2008-1090 (La. App. 3 Cir. 3/4/09), 6 So. 3d 326, *writ denied*, 09-0776 (La. 5/22/09), 9 So. 3d 148.

We have closely examined the WCJ's opinion and find that it did not impose on Whitten a higher burden of proof than the law requires. The first sentence of the contested passage correctly states the law that a claimant is entitled to compensation for aggravation of a preexisting condition, for the duration of the aggravation. The second sentence, though not artfully expressed, still conveys the finding that the evidence showed that after a period of aggravation, Whitten's current condition was only the natural progression of degenerative disk disease. We cannot find that the WCJ misstated the burden of proof or imposed a higher burden than a preponderance of the evidence. This assignment lacks merit.

### *Denial of Benefits*

By his remaining assignments of error, Whitten contends the WCJ committed manifest error in denying benefits: by finding that after he suffered an aggravation, he had returned to his pre-injury condition, or that his current condition was unrelated to the work accident; by failing to apply the presumption of causation and aggravation of a preexisting injury; and by finding that the work accident did not cause an injury to his lumbar spine. He argues that the deposition of Dr. Kerr was enough to satisfy his burden of proof, and suggests that Dr. Mead, UTI's expert, is a foot-and-ankle doctor who based his opinion on "experience," not any study. He submits that the opinion of the treating physician is entitled to more weight than that of one hired merely to examine the patient, *Leidelmeijen v. Ferncrest Manor Nursing Home*, 2015-1216 (La. App. 4 Cir. 3/16/16), 192 So. 3d 38, and cites the presumption of causation, *Smith v. Nu Verra Envtl. Solution*, 52,908 (La. App. 2 Cir. 10/30/19), 281 So. 3d 827. Notably, he shows that in *Smith v. Nu Verra*, this court reversed the same WCJ as in the instant case for failing to apply the presumption of causation and to accept the unrebutted testimony of the claimant; he contends the same result is warranted here. He concludes it is just plainly wrong, on this record, for the WCJ not to find an aggravation or a new injury.

Factual findings in workers' compensation cases are subject to the manifest error rule. *Buxton v. Iowa Police Dept.*, 09-0520 (La. 10/20/09), 23 So. 3d 275; *Crawford v. Town of Grambling*, 51,090 (La. App. 2 Cir. 1/11/17), 211 So. 3d 660. Under this rule, the reviewing court does not decide whether the WCJ was right or wrong, but only whether its findings are reasonable. When there are two permissible views of the evidence, the

WCJ's choice between them can never be manifestly erroneous or clearly wrong. *Id.* The reviewing court is emphatically not permitted to reweigh the evidence or reach its own factual conclusions from the record. *Marange v. Custom Metal Fabricators Inc.*, 12-2678 (La. 7/2/12), 93 So. 3d 1253; *Hill v. IASIS Glenwood*, *supra.* Whether a claimant has carried his burden of proof and whether testimony is credible are questions of fact for the WCJ. *Buxton v. Iowa Police Dept.*, *supra.*

As noted, an employee is entitled to workers' compensation benefits if he receives personal injury by accident arising out of and in the course of his employment. La. R.S. 23:1031 A. Accident is defined as an "unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration." La. R.S. 23:1021 (1). The work-related accident requirement is interpreted liberally, but the claimant still must prove it by a preponderance of the evidence. *Iberia Med. Ctr. v. Ward*, *supra*; *Crawford v. Town of Grambling*, *supra.* A claimant's testimony alone may be sufficient to meet this burden of proof, as long as no other evidence discredits or casts serious doubt on the claimant's testimony, and that testimony is corroborated by the circumstances following the incident. *Id.*

The opinion of the treating physician should be accorded greater weight than that of a physician who sees the patient only once or twice. *Miller v. Clout*, 03-0091 (La. 10/21/03), 857 So. 2d 458; *Bradley v. St. Francis Med. Ctr.*, 51,572 (La. App. 2 Cir. 9/27/17), 244 So. 2d 722, and

citations therein. However, the treating physician's opinion is not irrebuttable, and the WCJ is required to weigh all the medical testimony. *Id.*

Disability may be presumed to have resulted from an accident if, before the accident, the claimant was in good health, but commencing with the accident, the symptoms of the disabling condition appear and continuously manifest themselves afterward, provided that there is sufficient medical evidence to show a reasonable possibility of a causal relationship between the accident and the disability, or the nature of the accident, combined with the other facts of the case, raises a natural inference of causation. *Doucet v. Baker Hughes Prod. Tools*, 93-3087 (La. 3/11/94), 635 So. 2d 166; *Crawford v. Town of Grambling, supra.*

We have closely reviewed the medical evidence. Dr. Kerr's description of "dynamic spondylolisthesis" is very cogent and, standing alone, would probably warrant reversing the judgment. However, every other doctor who treated Whitten described something different. Dr. Goddard, at Work Kare, found merely degenerative changes and spondylolysis, and released him to regular work; Dr. Merrick, at Azalea, reviewed two MRIs and suggested the SCS; and his colleague at Azalea, Dr. Michaels, reviewed the same MRIs and concluded no further treatment was needed. Dr. Mead, who was retained only for a second opinion, described a temporary aggravation that had resolved to maximum medical improvement. Even Dr. Kerr did not initially suggest the two-level, 360-degree fusion surgery; he first suggested the less invasive procedure of implanting an SCS. Looming over the whole discussion was the specter of Whitten's gross obesity, which all experts seemed to agree placed an undue burden on his lumbar spine and contributed to his current condition. As convincing as Dr.

11

Kerr's later diagnosis and recommendation may seem, there was abundant expert evidence from which a different conclusion could be drawn. On this record we cannot say the WCJ was plainly wrong to find that after a period of aggravation, Whitten's current condition was not the result of the work-related accident. Whitten's second assignment of error lacks merit.

The presumption of causation hinges on a finding of sufficient medical evidence to show a reasonable possibility of a causal relation between the accident and disability. *Doucet v. Baker Hughes*, *supra*; *Crawford v. Town of Grambling*, *supra*. The testimony and documents already discussed – Drs. Goddard, Merrick and Michaels, and Mead – provided a reasonable possibility that Whitten's back had returned to its pre-injury status and that any lingering problem was preexisting or a result of obesity. This is unlike the situation in *Smith v. Nu Verra*, *supra*, in which we found that the "medical evidence does not establish that claimant's work-related injury had resolved or that the aggravation of his pre-existing degenerative condition was limited in duration." Here, the WCJ chose between two permissible views of the evidence, and we cannot say that she was clearly wrong. *Buxton v. Iowa Police Dept.*, *supra*; *Crawford v. Town of Grambling*, *supra*. Whitten's third assignment of error lacks merit.

Finally, the WCJ explicitly found that the claim "was accepted in Louisiana for payment of benefits" and that "there was an aggravation of the preexisting condition." Whitten's fourth assignment of error, asserting that the WCJ found "that the work accident did not cause an injury to plaintiff's lumbar spine," lacks merit.

**CONCLUSION**

For the reasons expressed, the judgment is affirmed.  All costs are to be paid by the appellant, Joe Whitten.

**AFFIRMED**.